**UNITED STATES of America, Plaintiff,**

v.

**James D. DIEMER, et al., Defendants.**

Civ. A. No. 91–5662.

United States District Court,
D. New Jersey.

Aug. 1, 1994.

Beverly A. Moses, U.S. Dept. of Justice, Tax Div., Washington, DC, for plaintiff.

Donald L. Berlin, Berlin, Kaplan, Dembling & Burke, Morristown, NJ, for defendants.

## *OPINION*

WOLIN, District Judge.

At issue in this matter is what claim does the United States currently have in real

property to which its tax lien originally gave it a tenancy by the entirety interest in 1980. Before the Court is the motion of the United States for partial summary judgment wherein the Government seeks a ruling that its tax lien attaches to an outright one-half interest in the subject property and the cross-motion of defendants First National Bank of New Jersey, James D. Diemer and Julia Diemer (collectively "Diemers") which seeks a ruling that the Government's lien only attached to the debtor/taxpayer's tenancy by the entirety interest subject to the non-debtor's right of survivorship. For the following reasons, the Court will deny the Government's motion but will grant the cross-motion to the extent that the Court finds that the Government has a claim on the property to the extent of the debtor/taxpayer's interest.

Additionally, the Diemers' cross-motion for partial summary judgment seeks a ruling that they are entitled to be equitably subrogated to those liens which have priority over the tax lien, to the extent that such liens were satisfied by their grantor. The Court will deny this cross-motion.

## BACKGROUND

Herbert Sylvester and his then wife Frances Sylvester acquired their marital residence in the Borough of Leonia, Bergen County, New Jersey (the "Property") as tenants by the entirety in 1973. Due to Mr. Sylvester's failure to pay income and social security taxes of the employees of his construction firm, the Internal Revenue Service ("IRS" or "Government") filed a tax lien against him on June 26, 1980. The lien was properly filed with the Bergen County Clerk's Office in the amount of $62,523.21.

In October, 1980, Mr. Sylvester conveyed his interest in the Property subject to the IRS lien and other "unsatisfied mortgages or liens of record" to his wife. Mrs. Sylvester then mortgaged the property to Midlantic National Bank. This mortgage was also properly recorded. Pursuant to a subordina-

tion agreement, the IRS expressly agreed to subordinate its lien to this mortgage. On June 4, 1985, its penalty assessment remaining unpaid, the IRS refiled the lien against Mr. Sylvester.

The Sylvesters' marriage was dissolved on December 19, 1986 pursuant to a Judgment of Divorce. That Judgment incorporated a "Property Settlement Agreement", dated December 11, 1986, which *inter alia*, provided that the Property was to be sold, that prior liens (including the IRS lien) were to be paid from the proceeds of the sale, and that Frances Sylvester would be entitled to retain any surplus proceeds.

On November 4, 1988, Mrs. Sylvester entered into a contract for sale with Fred A. Avila and Molly Avila (collectively "Avilas") for the purchase of the property for $580,000. Closing was held on April 18, 1989. The Avilas secured TICOR Title Insurance Company ("Ticor") for a title insurance commitment. Ticor noted as an exception to title the existence of the IRS lien. However, the exception for this lien was omitted, apparently upon the belief that the original 1980 lien had expired and that the 1985 lien was a new lien, arising at a time when Mr. Sylvester no longer had an interest in the Property. Accordingly, while a portion of the purchase money was used to satisfy other liens and claims against the Property, the IRS lien remained unpaid.

The Avilas, after commencing litigation in the state court to compel Mrs. Sylvester to satisfy the lien,[1] sold the Property to the Diemers.

By way of this action, the IRS seeks to foreclose the tax lien which attached to Mr. Sylvester's interest in the Property and to use the proceeds of the foreclosure sale to satisfy the lien, plus *inter alia* interest.

## DISCUSSION

### I. Standard of Review

 Summary judgment shall be granted if "the pleadings, depositions, answers to

---

1. While the trial court ruled that it was the obligation of Mrs. Sylvester to satisfy the lien, the Appellate Division of the Superior Court, reversed, holding that the Avilas and Ticor, in failing to withhold money to satisfy the lien at closing, had waived their right to require Mrs. Sylvester to do so. Certification to the New Jersey Supreme Court was denied. It should be noted that the United States was not a party to this proceeding.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons*, 871 F.2d 409, 419 (3d Cir.1989).

■ "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.*

■ When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

■ Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–233, 106 S.Ct. at 2552.

■ In opposing summary judgment, a non-movant may not "rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a nonmovant's] memorandum and pleadings are insufficient to repel summary judgment"); *see* Fed.R.Civ.P. 56(e). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). The "unsupported statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Schoch*, 912 F.2d at 657.

## II. The Government's Interest

The Government seeks a ruling that its tax lien attached to an outright one-half interest in the current value of the Property. The Diemers seek a ruling that the lien is constrained by Mrs. Sylvester's right of survivorship. An analysis of the facts and law clearly show that neither party is wholly entitled to the ruling it seeks.

■ It is undisputed that the United States has an interest in the Property by virtue of the tax lien.[2] To determine the

---

2. A tax lien "shall arise in favor the United States upon all property and rights to property, whether real or personal, belonging to" a person, if such "person liable to pay any tax neglects or refuses

nature of the legal interest which the lien attaches, state law controls. *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985) (citations omitted); *United States v. Mitchell,* 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406 (1971) (citations omitted); *Talbot v. United States,* 850 F.Supp. 969 (D.Wyo.1994) *quoting, Morgan v. Commissioner,* 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 1035 (1940). This follows from the fact that the federal revenue acts "create[ ] no property rights but merely attach[ ] consequences, federally defined, to rights created under state law." *Id.* 472 U.S. at 722, 105 S.Ct. at 2925 (citation omitted). Therefore, the Court must turn to New Jersey law to determine the property interest to which the lien attached.[3]

 All parties agree that at the time the lien arose, Mr. and Mrs. Sylvester owned the Property as tenants by the entirety. Under New Jersey law, tenants by the entirety each "hold[ ] as tenants in common for their joint lives," *Freda v. Commercial Trust Co.,* 118 N.J. 36, 570 A.2d 409 (1990), *quoting King v. Greene,* 30 N.J. 395, 412, 153 A.2d 49 (1959), subject to the other spouse's right of survivorship. While the rights of each spouse are alienable, the right of ownership is "indestructible by unilateral action." *State v. U.S. Currency,* 239 N.J.Super. 241, 246, 570 A.2d 1304 (Sup.Ct.1990), *quoting King v. Greene,* 30 N.J. 395, 412, 153 A.2d 49 (1959). Because a tax lien extends only so far as the taxpayer's interest in the property to which it attaches, *U.S. v. Durham Lumber Co.,* 363 U.S. 522, 526, 80 S.Ct. 1282, 1284, 4 L.Ed.2d 1371 (1960), the lien attached to an undivided one-half interest in the Property subject to Mrs. Sylvester's right of survivorship. *See Freda,* 118 N.J. at 48, 570 A.2d 409.

The Diemers argue that notwithstanding the 1980 conveyance from husband to wife and the 1986 divorce, the United States' interest is still constrained by Mrs. Sylvester's

right of survivorship. They submit that under *Freda v. Commercial Trust Co.,* 118 N.J. 36, 570 A.2d 409, the lien upon Mr. Sylvester's tenancy by the entirety interest cannot be enhanced beyond the interest he had at the time of the lien. That is, the right of survivorship cannot be extinguished.

In *Freda,* the husband had mortgaged his interest in real property he and his wife owned as tenants by the entirety. *Id.* at 39, 570 A.2d 409. Subsequently, the parties were divorced. The distribution plan required the husband to convey his interest in the property to the wife and to hold her harmless of any and all liens existing on the property at the time of the conveyance. *Id.* At the time of the divorce, the wife was unaware of the mortgage. *Id.* After the divorce, the bank sought to foreclose its lien on the husband's interest in the property. The *Freda* court found that the wife took the property subject to the bank's interest in it, but further held, that a lienholder's interest in the property is constrained by the non-debtor spouse's right to survivorship. *Id.,* at 48, 570 A.2d 409 ("freeing the interest of the debtor-spouse from the non-debtor spouse's right of survivorship would enhance the lien beyond its value when the husband and wife owned the property as tenants by the entirety"). By barring sale and partition because of the continuing right of survivorship the non-debtor spouse was protected from losing her home. *See id.* at 46, 570 A.2d 409; *In re Youmans,* 117 B.R. 113, 117 (Bkcy D.N.J. 1990).

 *Freda* addresses the situation where the non-debtor spouse retains property burdened by a lien on the interest of the debtor spouse's tenancy by the entirety interest. Pursuant to that case, a creditor cannot satisfy his lien by ousting the non-debtor spouse from property because the non-debtor spouse's right of survivorship continues despite any subsequent conveyances. Thus, the Diemers' argument that Mrs. Sylvester's right of survivorship was not extinguished

---

to pay the same after demand". 26 U.S.C. § 6321.

**3.** The Diemers posit that the Court should be guided by *Talbot v. United States,* 850 F.Supp.

969 (D.Wyo.1994). The Court finds the case inapposite because Wyoming law regarding tenancies by the entirety is not comparable to New Jersey law.

notwithstanding the 1980 conveyance from debtor to non-debtor, and the 1986 divorce, is correct. Because after each of these transfers Mrs. Sylvester retained title, possession and interest in the Property, *Freda* requires that the IRS lien be subject to her right of survivorship.

Were the facts of this case to end here (*i.e.*, with Mrs. Sylvester still having interest, title, or possession in the Property), the Court's analysis would also end. However, this case involves another interesting twist. In 1988, Mrs. Sylvester sold her interest in the Property to the Avilas, who subsequently conveyed the Property to the Diemers. Relying on *Freda*, the Diemers ask that the Court to find "the United States' interest . . . is only that of an undivided one-half interest in the Property, *subject* to Frances Sylvester's right of survivorship." Defendants' James D. Diemer, Julia Diemer, and Citizens First National Bank of New Jersey's Brief ("Defendants' Brief") at 10 (emphasis in original).

▪ Defendants posit that to hold otherwise would elevate the IRS lien beyond what the debtor spouse's interest ever was. *See* Defendant's Brief at 8, 12. This theory is flawed for two reasons. First, it assumes that the rights of the Government can never increase. It is a well-known rule that once a tax lien has attached to the debtor/taxpayer's interest in property, it cannot be defeated or decreased by subsequent transfers. *United States v. Rodgers*, 461 U.S. 677, 691 n. 16, 103 S.Ct. 2132, 2141, n. 16, 76 L.Ed.2d 236 (1983) ("the lien cannot be extinguished (assuming proper filing and the like) simply by a transfer or conveyance of the interest") (citation omitted); *United States v. Bess*, 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958) ("The transfer of property subsequent to the attachment of the lien does not affect the lien, for it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes *cum onere*. . . .") (citation and quotation marks omitted). Thus, the debtor/taxpayer's interest at the time the lien arises is a floor against which the Government's interest cannot fall

below. However, as the Government correctly points out, there is no ceiling. Where state law creates an interest in property, a tax lien attaches to all property and rights to property belonging to the debtor/taxpayer during the life of the lien, including any property or rights to property acquired after the lien arises. *See Glass City Bank v. United States*, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945); *In re Victor Brewing Co.*, 146 F.2d 831 (3d Cir.1944), *aff'd*, 326 U.S. 265, 66 S.Ct. 108, 90 L.Ed. 56 (1945); Internal Revenue Reg. sec. 301.6321–1.

Second, the Diemers' analysis requires the Court to find that under New Jersey law once a right of survivorship is created it cannot be destroyed to satisfy a lien prior to the death of the non-debtor spouse. This the Court deems the expansive reading of *Freda*.

▪ While the right of survivorship survives transfers where the non-debtor spouse retains an interest, it does not survive sale by the nondebtor spouse. *Dvorken v. Barrett*, 100 N.J.Super. 306, 241 A.2d 841 (App.Div.), *aff'd*, 53 N.J. 20, 247 A.2d 674 (1968) (right of survivorship cannot be taken away without non-debtor spouse's consent); *Gauger v. Gauger*, 73 N.J. 538, 542, 376 A.2d 523 (1977) (the right of survivorship can be destroyed by either joint tenant's sale or transfer of his or her interest in the property) (citation omitted); *In re Youmans*, 117 B.R. at 117 ("if for some reason the property is . . . sold prior to the death of one spouse, the right of survivorship is completely destroyed . . ."). When Mrs. Sylvester sold her interest in the Property to the Avilas, according to New Jersey law, her right of survivorship was freed. To find otherwise, the Court would hold that the tax lien was subject to her right of survivorship *ad infinitum*.

Thus, because Mrs. Sylvester's interest, possession and title in the Property was eliminated at the time of the 1988 sale to the Avilas, her right of survivorship was destroyed. As a result, the constraints of *Freda* do not continue to apply.[4] Accordingly,

---

4. The Government argues that *Freda* does not apply because the matter *sub judice* is factually

distinct in that Mrs. Sylvester was "ordered by the divorce court to sell the property and to pay

the United States' lien is no longer constrained by her right of survivorship.

While the Court agrees with the Government that the tax lien attached to an one-half interest in the Property, it rejects the argument that the Government has a right to an outright one-half interest in the current value. In essence, the Government is positing that it has a right to the appreciation that Mr. Sylvester's interest would have realized. According to their argument, at the time of the Sylvester's 1986 divorce, they held the Property as tenants by the entirety. The divorce converted the tenancy by the entirety to a tenancy in common. *See* United States' Moving Memorandum, at 6. Because of the lien, the Government stepped into the shoes of Mr. Sylvester and held an undivided one-half interest subject to his wife's rights of survivorship. *See id.* at 8. When Mrs. Sylvester sold the Property she sold only what she owned—a one-half interest—her right of survivorship having been destroyed by the sale. *Id.* Accordingly, the argument concludes, the Avilas, and subsequently the Diemers, hold with the Government as tenants in common.

■■■ Unfortunately, the Government's theory ignores a crucial fact: the 1980 conveyance from husband to wife. This transfer extinguished Mr. Sylvester's interest, possession and title in the Property. When his interest in the Property ran out in 1980, Mrs. Sylvester owned the Property in fee simple subject to, *inter alia,* the tax lien. The 1988 sale to the Avilas extinguished the right of survivorship and vested the Avilas with a fee simple interest subject to the tax lien.

■■■ As for what the IRS can recover, the Government seemingly submits that it is still entitled to an outright one-half interest in the current value of the Property because it passed burdened. If the Court were to measure the amount the Government could

recoup in the manner proposed, it would find that at the time the lien attached all the taxpayer's interest automatically transferred to and was vested in the Government. This method of measurement ignores the fact that a federal tax lien is only a claim or charge on the debtor/taxpayer's property and rights to property. *See* I.R.C. § 6321. The lien, by itself, does not transfer the debtor/taxpayer's title, possession or interest in the property. Until the Government forecloses, the lien does not affect the nature of the encumbered property; it only attaches to the Property as it finds it.

■■■ The lien gave the Government a claim on the Property to the extent of Mr. Sylvester's interest. *See U.S. v. Durham Lumber, Co.,* 363 U.S. at 526, 80 S.Ct. at 1284 (a tax lien extends only so far as the taxpayer's interest in the property to which the lien attaches). That claim is initially equal to what is accessible to the debtor/taxpayer, *see United States v. National Bank of Commerce,* 472 U.S. 713, 725–726, 105 S.Ct. 2919, 2926–2927, 86 L.Ed.2d 565 (1985) (citations omitted), up to the value of the lien, plus interest and costs. Because of the after-acquired rights language, that claim has a potential for growth. The lien, in essence, vests the Government with the hope that in the debtor/taxpayer's hands his interest will appreciate in value, either due to an increase in his title or to a rising real estate market. But, that hope must be extinguished when the debtor/taxpayer no longer has any interest in the Property. Thus, while the lien follows the property even after it has been transferred to a non-debtor, *see Rodgers,* 461 U.S. at 691, n. 16, 103 S.Ct. at 2141, n. 6; *Bess,* 357 U.S. at 57, 78 S.Ct at 1058, and while the extent of the debtor/taxpayer's liability under the lien is not fixed, upon foreclosure the Government is limited to recoup what the debtor/taxpayer could have.[5]

---

the United States' lien." United States' Moving Brief, at p. 7. While the Court agrees that *Freda* does not apply, this conclusion merely reflects the fact that a sale occurred. The Court's conclusion would not be affected if the sale was not judicially ordered.

5. This line of reasoning does not assume that the debtor/taxpayer's total liability to the IRS se-

cured by the lien is somehow fixed at the time he sells the property. The statute provides that the debtor/taxpayer's liability to the IRS is not fixed at the moment of sale. 26 U.S.C. § 6322 (a tax lien "shall continue until the liability for the amount so assessed ... is satisfied or becomes unenforceable by reason of lapse of time"). Because a lien continues despite a sale (so long as it

The following hypotheticals help illustrate the Court's conclusion.

*Hypo # 1.* H and W, husband and wife buy Blackacre as tenants by the entirety in January, 1980. The value of Blackacre is a $100,000. As a result, each own an undivided interest of $50,000 plus the right of survivorship. H and W subsequently encumber Blackacre with $50,000 in mortgages. Afterwards, H and W have equity of $50,000 of which each would have an undivided one-half interest of $25,000 plus the right of survivorship ($= \frac{1}{2} \times$ (value − mortgages)).

In April, 1980 a federal tax lien of $60,000 attaches to H's interest in Blackacre.[6] All other things being equal, in April 1980, both H and W would retain an undivided one-half interest equal to $25,000 plus the right of survivorship; the Government, however, has a claim in H's interest.

In November, 1980, H transfers his encumbered interest to W. W now owns the entire fee; but, because the lien follows Blackacre, her fee is subject to the lien. She receives H's $25,000 interest plus the lien. Thus, when added with her original interest, she now owns all $50,000 in equity. While the IRS can enforce its entire tax lien without limitation, if the IRS were to foreclose on Blackacre after the transfer, ignoring W's right of survivorship, it could only recover what H would have—$25,000.

The above hypothetical assumed throughout the value of Blackacre remained constant. The Court will now relax that.

*Hypo # 2.* Same facts a Hypo # 1 (*i.e.*, mortgages that are senior to the lien total $50,000; lien is $60,000), except prior to the transfer from H to W, the value of Blackacre appreciated (due to a rising real estate market) to $500,000. Prior to the transfer, all other things being equal, H would own an undivided one-half interest of $225,000 (one-half of $500,000 less $50,000 (mortgage)) plus the right of survivorship, subject to the lien. However, in this hypothetical, H's interest is sufficient to cover his entire tax liability of $60,000. Accordingly, the Government could receive $60,000 from H's $225,000 interest.

After the transfer, the lien follows Blackacre; W owns the fee which is encumbered by the lien; and H owns nothing. It would be absurd to increase the amount the Government could receive to the full $225,000 that H transferred when H's liability is only $60,000.

Would the result be any different if there was negative equity at the time of the transfer?

*Hypo # 3.* Same facts as Hypos # 1 and 2—*i.e.*, mortgages that are senior to the tax lien total $50,000; lien is $60,000 with no interest or penalties—except here the value of Blackacre is $20,000. Before the transfer, both H and W have a negative equity in the amount of $15,000 ($= \frac{1}{2} \times$ (value − mortgages)) of which H's interest is constrained by the lien.

This hypothetical illustrates that where there is negative (or insufficient) equity, the Government's only hope for recovering any amount of the lien is based on an increase in value of Blackacre. However speculative, this hope prevents the lien from being worthless. Nevertheless, whatever speculative value such a lien has is dependent on whether title is still in the debtor/taxpayer.

Thus, the Court concludes that while the Government need not fix the amount of Mr. Sylvester's tax liability at the time Mr. Sylvester transferred his title and interest to Mrs. Sylvester, it cannot recover more from a foreclosure sale than his interest, up to the value of the total tax liability. Under these facts, the Government may receive a one-half interest in the Property valued at the time Mr. Sylvester transferred his title and interest to Mrs. Sylvester, subject to other liens or mortgages that had priority.

█ No one disputes that the amount due on the lien as of November 5, 1979 was $62,523.21, and because of, *inter alia*, inter-

---

is properly recorded), there is no basis for fixing the amount of the lien at the time of sale.

**6.** It is assumed throughout that the federal tax lien is subordinated to the mortgages. It is also assumed for the hypotheticals that the tax lien carries no interest, penalties, or fines to increase H's tax liability.

est, the total amount due as of September 30, 1993 was $274,612.26. It is uncontested that Mr. Sylvester transferred his interest on October 3, 1980. However, it is a genuine issue of material fact what the value of his interest was on that date. Additionally, there is nothing before the Court that suggests the total value of other liens, mortgages, etc., or their priority vis-a-vis the federal tax lien on that date.[7]

Thus, the motion for summary judgment is denied. The cross-motion for partial summary judgement is granted to the extent that the Court finds that the United States' lien on the Property presently held by the Diemers attaches only to Mr. Sylvester's interest valued at the time of the transfer.

## III. Equitable Subrogation

In their cross-motion, the Diemers assert that since a portion of the Avilas purchase money was applied to satisfy liens having priority over the tax lien, they are entitled to stand in the shoes of those mortgage and judgment lienholders having priority over the lien. The ruling the Diemers seek is premised upon the doctrine of equitable subrogation.

Equitable subrogation is a well recognized doctrine under New Jersey law. *See e.g., Gaskill v. Wales,* 36 N.J. Eq. 527, 533 (E & A 1883); *Home Owners' Loan Corp. v. Collins,* 120 N.J.Eq. 266, 184 A. 621 (Ch.Div.1936); *Gutermuth v. Ropiecki,* 159 N.J.Super. 139, 387 A.2d 385 (Ch.Div.1977); *Equity Savings and Loan Association v. Chicago Title Insurance Co.,* 190 N.J.Super. 340, 463 A.2d 398 (App.Div.1983); *Goldome Realty Credit Corp v. Harwick,* 236 N.J.Super. 118, 564 A.2d 463 (Ch.Div.1989). The doctrine is founded upon principles of equity. *Gaskill,* 36 N.J.Eq. at 533. It provides that "[w]here a purchaser retains funds in escrows to satisfy existing mortgage[s] and judgment liens, and in fact ultimately uses such funds to satisfy those liens, such purchaser stands in the shoes of those mortgage and judgment lienholders and may assert their claims to priority as against any subse-

quent lien claimant." *Gutermuth,* 159 N.J.Super at 143, 387 A.2d 385. That is, subrogation is the giving to the payor, the rights and remedies of the satisfied creditor.

New Jersey courts have used the doctrine to prevent a later or intervening lienor from being unjustly enriched through his unearned and fortuitous advancement in priority by reason of fraud or mistake of the grantee. *See* 29 N.J. Practice at 669; *Gaskill,* 36 N.J.Eq. at 533; *Home Owners' Loan Corp.,* 120 N.J.Eq. at 268 (equitable subrogation used in situations in which "a state of facts fraudulently concealed from the lender, or of which he was ignorant, impaired the lien of the new mortgage."); *Kaplan v. Walker,* 164 N.J.Super 130, 138, 395 A.2d 897 (App.Div.1978) (in addition to the situation where one who, having existing rights and property, pays the debt of another to protect his own rights, subrogation will be extended to one who supplies funds to discharge an old lien when the new security, by fraud or mistake, turns out to be defective).

For example, in *Gutermuth,* 159 N.J.Super 139, 387 A.2d 385, purchasers of real property satisfied existing liens and encumbrances on the property at closing. Unknown to the purchasers, a judgment was docketed against the grantee shortly after the conveyance of the property, but before the deed and mortgage were recorded. The Chancery Division held that where a purchaser pays off and discharges outstanding mortgages and judgments, the rights of the purchasers are subrogated to the priority position of the discharged lienors. *Id.* at 143, 387 A.2d 385. In exercising its discretion to grant such relief, the court placed great emphasis on the fact that the later lienholder did not expect his interest to claim priority over all others. *Id.; see also Home Owners' Loan Corp.,* 120 N.J.Eq. at 266 (mortgagee who paid off and discharged all encumbrances at closing, but who's who's agent negligently failed to find an outstanding mortgage, was entitled under doctrine to be subrogated to the position of its discharged creditors); *Trus Joist Corp. v. National Fire Insurance Co.,* 190 N.J.Super 168, 179, 462 A.2d 603 (App.Div.1983), *re-*

---

7. The Court assumes without deciding that while the net value of Mr. Sylvesters interest is fixed at the time of the transfer, the Government is entitled to the present value of that interest.

*versed on other grounds,* 97 N.J. 22, 477 A.2d 817 (1984) (mortgagee, who negligently accepts a mortgage despite knowledge of challenge to mortgagor's title, will be subrogated to the rights of the parties whose liens were satisfied from the proceeds of the loan secured by the mortgage).

It is undisputed that the Avilas would be equitably subrogated to the various liens they satisfied. The Diemers submit that because every deed conveying lands includes all the right, title and interest in law and in equity of the grantor, *see* N.J.S.A. 46:3–13, when the Property was conveyed to them, the right of equitable subrogation was similarly transferred.

That subrogation does not run with the land finds support in New Jersey case law. *Gaskill v. Wales,* 36 N.J.Eq. 527, the "controlling pronouncement of New Jersey law" on the subject of equitable subrogation, *In re Bridge,* 18 F.3d 195, 203 (3d Cir.1994), stated that subrogation is not an absolute right. *Gaskill,* 36 N.J.Eq. at 533. It is a device of equity designed to prevent the subordination of one who in good conscience satisfied existing debt but, without the aid of equity, will nevertheless be prejudiced by mistake or fraud. Thus, it is to be applied with "due regard to the legal and equitable rights of others." *Id.*

▮▮▮ Indeed, subrogation exists only: (1) by agreement; (2) by a judicial device of equity; or (3) by statute. *Home Owners' Loan Corp.,* 120 N.J.Eq. at 267–268; *see also City of Union City v. Veals,* 247 N.J.Super. 478, 484, 589 A.2d 1028 (App.Div.1991). In other words, "subrogation rights neither arise spontaneously nor are they free floating or open-ended." *Veals,* 247 N.J.Super at 484, 589 A.2d 1028. Guided by these principles, the Court must reject the Diemers argument that subrogation runs with the land.

▮▮▮ In fact, the Court finds that the Diemers do not have an equitable right of subrogation. First, there was no agreement to subrogate, nor was there any formal assignment. *See Metrobank v. National Community Bank,* 262 N.J.Super. 133, 143, 620 A.2d 433 (App.Div.1993). Second, as discussed above, N.J.S.A. section 46:3–13 does

not create a right of subrogation. As a result, if subrogation were to apply here it would have to be because the equities so demand.

▮▮▮ As an equitable doctrine, subrogation is only granted in the exercise of the Court's equitable discretion. *Id.* at 144. The equities here are not in favor of the Diemers. The Diemers took no affirmative action to protect their rights in the Property which resulted in them having an expectation that they would have an advantage over the tax lien. Equity demands that under these facts subrogation would only be is available if the Diemers paid a debt of another with a view to protecting their rights and interest in the Property. *Meier v. Planer,* 107 N.J.Eq. 398, 152 A. 246 (Ch.Div.1931) (entity who merely pays an existing debt and has no interest menaced by it is only a voluntary payor and has no claim to subrogation); *Deskovick v. Porzio,* 78 N.J.Super. 82, 187 A.2d 610 (App.Div.1963) (same); *Home Owners' Loan Corp.,* 120 N.J.Eq. at 267–268 (subrogation not only exists in favor of one who, to protect his rights, pays the debt of another, but also one who, through fraud or mistake, takes new security which turns out to be defective); *Kaplan,* 164 N.J.Super. 130, 395 A.2d 897 (same).

The Diemers did nothing to change their position or that of the Government. Therefore, if the Diemers were allowed to be subrogated, they would be unjustly enriched at the expense of the Government. On the other hand, if this Court does not subrogate the Diemers, they will suffer no loss that they would not have had they known the tax lien was valid and still purchased the Property. It would be a most inequitable decision to reward the Diemers for doing nothing.

Based on the foregoing, the Court finds that the Diemers are not entitled to be equitably subrogated to the tax lien and therefore will deny the Diemers cross-motion for partial summary judgment.

## CONCLUSION

For the reasons expressed above, the Court will deny the Government's motion for partial summary judgment. It will grant in

part the Diemers' cross-motion for summary judgment but will deny their cross-motion seeking dismissal on the grounds of equitable subrogation.

The Court notes that it will need a hearing to determine the value of the debtor/taxpayer's interest in the Property in 1980, as well as the priority and value of other liens or judgments at that time.

An appropriate order is attached.